# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

RON SARFATY

                              Plaintiffs,

        vs.

CITY OF LOS ANGELES

                              Defendant.

CASE NO.  2:17-cv-03594-SVW-KS

**FINDING OF FACT AND
CONCLUSIONS OF LAW**

**INTRODUCTION**

On July 22, 2020 and July 23, 2020, the Court held a bench trial in this action to determine whether Defendant the City of Los Angeles ("the City") violated Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.* (the "ADA" or "Title II"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), and California Government Code § 11135. In advance of trial, Plaintiff Ron Sarfaty ("Plaintiff") and the City submitted declarations containing their witnesses' direct testimony, as required by the Court's Standing Order for non-jury trials. The parties presented their witnesses at trial, at which time the Court engaged in its own questioning of each witnesses and allowed subsequent cross-examination and re-direct questioning by the parties. Having carefully reviewed and considered the evidence presented at trial, the Court issues the following

1

findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

For all findings of fact set forth below, in making any credibility determinations regarding witness testimony, the Court has considered, among other things, the manner in which the witnesses testified, their interest in the outcome of the case, and the reasonableness of their testimony in light of all of the evidence. The Court has also considered the relevant factors in Section 1.14 of the Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit (2017 Edition), located at http://www3.ce9.uscourts.gov/jury-instructions/sites/default/files/WPD/Civil_Instructions_2018_9_0.pdf

**FINDINGS OF FACT**

1.  Plaintiff is unable to walk or stand independently as the result of a stroke. He uses a wheelchair for mobility and a modified van equipped with a power lift for transportation. Dkt. 87 at 2. At the time of the events that precipitated this litigation, he used a side-deploying wheelchair lift that deployed out of the passenger side of his van. *Id.* Currently, Plaintiff uses a rear-deploying lift on his new modified van. On occasion he travels in his friend's van and uses a portable ramp that lets him enter and exit through the passenger side of the vehicle. *Id.*

2.  In April 2015, the City altered its on-street public parking on Reseda Boulevard as part of the City's "Great Streets Initiative." Plaintiff Trial Ex. 7 at 3, 13. The alterations included the installation of cycletracks and buffer zones containing bollards, and the restriping/relocation of parking spaces away from the curb. *Id.*; *see also* City Trial Ex. 4, 5, 6.

3.    The alteration to this portion of Reseda Boulevard was undertaken based on the elevated rate of serious and fatal accidents that had occurred on this stretch of Reseda. Dkt. 84 at 3; Dkt. 84-5 at 2-3. The Great Streets Project as a whole was implemented to protect the public and increase safety on the City's streets. Dkt. 84 at 1-2. The City asserts that one of the goals of the Great Streets Project was to "improve access and mobility" and that the alterations to Reseda Boulevard involved accessibility review. *Id.* at 2-3. No portion of the information packet describing the Reseda Boulevard project to residents discusses accessibility, references disabled individuals, or depicts wheelchair use. *See generally* City Trial Ex. 5. A recurring graphic in the informational packet distinguishes between the separated bike lane, with the phrase "BIKE" below it, and the sidewalk, with the phrase "WALK" below it. *Id.*

4.    During the course of the alteration, the City conducted community evaluations and engaged in accessibility tests, including utilizing lifts, ramps and other mobility devices used by disabled persons on the altered portions of Reseda Boulevard. Dkt. 84-5 at 3-4. Individuals reported to City personnel involved with the project that side vehicle lifts used by disabled individuals could not longer be directly deployed onto the sidewalk. *Id.* at 4.

5.    The altered on-street parking provides 73 public parking spaces dispersed over ten block faces. Plaintiff's Ex. 7 at 13. None of the altered parking spaces are marked or identified as reserved for use by individuals with disabilities or are directly adjacent to an accessible route to reach the sidewalk.

3

6. There is a signaled, mid-block crosswalk on the altered portion of Reseda between Rayen and Nordhoff streets that has curb ramps on each end. The rest of the altered portion of Reseda contains no mid-block curb ramps, only active and abandoned vehicular driveways. All but one of these driveways present slopes exceeding 8.33%. Dkt. 89 at 2; Dkt. 85 at 7-8, Plaintiff Trial Ex. 7 at 14.

7. Given the position of the mid-block curb ramp approximately halfway between Rayen and Nordhoff, this means that in most cases (with the exception of the shorter distance between Rayen and Gresham, which is only 356 feet), there are roughly 200 yards between accessible intersections on the altered portion of Reseda Boulevard. *See* City Trial Ex. 4. The parking spaces on the altered portion of Reseda Boulevard are not evenly distributed, and in some cases cluster near the intersections, and in other cases are clustered near the middle of the block because of the existence of buffer zones near intersections that restrict parking. *Id.*

8. Before April 2015, Plaintiff frequented businesses on Reseda Boulevard including Falafel Palace and Njoy Games and Comics a few times a month. On these occasions, Plaintiff would park his van curbside on Reseda and exit directly onto the sidewalk using his side-deploying wheelchair lift and proceed to his intended destination via the sidewalk.

9. After the 2015 alterations to the on-street parking on Reseda Boulevard. Plaintiff could no longer park curbside and exit his vehicle directly on to the sidewalk. Plaintiff had to deploy his lift into the active bike lane and travel extended distances in the active bike lane to get to the nearest

intersection with a curb ramp. Plaintiff was almost hit by a screaming bicyclist while traveling in the bike lane, making him anxious and uncomfortable and causing him to experience difficulty, distress and embarrassment. Plaintiff could not ride continuously in the buffer zone between the parking space and the bike lane because there were bollards placed there. Dkt. 87 at 3.

10.    On August 25, 2015, Plaintiff again visited Reseda Boulevard and encountered the same problems with the on-street parking spaces described above. Plaintiff testified that he has substantially curtailed his visits to establishments in this area of Reseda Boulevard on the basis of these experiences. The Court found Plaintiff's testimony on his prior experiences to be credible throughout the trial.

11.    Plaintiff wrote letters to the City's Department of Street Maintenance[1] on April 6, 2015, August 25, 2015, and January 6, 2016. These letters are essentially identical and indicate that he was unable to use his van to offload onto the sidewalk, and instead was forced to roll "nearly 100 yards" to reach a lowered curb. He suggests that the alterations must have been "designed by a moron with no sensitivity whatsoever to disabled or handicapped persons." He requests "an ETA when the streets will be brought back to the safe way it was configured before this silliness" at the end of each letter. *See* Plaintiff Trial Ex. 11, 12, 13. None of Plaintiff's letters request additional accessible parking on the altered portion of Reseda Boulevard. Plaintiff never attempted to call the Department of Street Maintenance, and never received a response to his letters.

---

[1] Plaintiff's direct testimony declaration alternatively refers to the Department of Street Maintenance as the "Department of Street Services." Dkt. 87 at 4. Each letter is addressed to the Department of Street Maintenance. Plaintiff Trial Ex. 11, 12, 13.

12. Multiple City employees submitted unrebutted direct testimony declarations that no records exist of any complaints made by Plaintiff. Dkt. 84-2 at 3; Dkt. 84-4 at 2. There is no evidence in the record or testimony that suggests that the Department of Street Maintenance has any responsibility for accessibility issues with regard to the City's on-street parking. Angela Kaufman ("Kaufman"), previously an ADA compliance officer for the City during the relevant time period, testified that while ADA complaints received by other departments should (as a general policy) be forwarded to the City's Department of Disability ("DOD") to determine whether accommodations can be made, in practice this does not necessarily occur.

13. Plaintiff and Kaufman had a phone call in September 2016, after Plaintiff's Counsel instructed him to both call and write to her. Plaintiff expressed his displeasure with the cycletracks, asked that they be removed, and expressed his belief that the ADA required the City to do so. Kaufman has a limited recollection of the phone call, and testified that she informed him that the City would not remove the cycletracks, and that it did not believe that the ADA required additional alterations to the cycletracks on Reseda Boulevard. Kaufman also provided Plaintiff with contact information for the Federal Highway Administration ("FHA") and suggested he contact them regarding his cycletrack complaint. Plaintiff later filed this lawsuit.

**CONCLUSIONS OF LAW**

1.     The Court reaffirms its conclusions made on the record on July 22, 2020 before the beginning of the bench trial that Plaintiff's claims are not moot because he has purchased a new rear-unloading handicapped van to replace the side-unloading handicapped van he used at the time he filed this lawsuit. Plaintiff remains a disabled individual, the on-street parking on the altered portion of Reseda Boulevard remains in the same configuration, and a determination that it violates the ADA may still lead to injunctive relief that will benefit Plaintiff. *See Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) ("A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'")

2.     The Court also incorporates by references its prior Orders, to the extent that they held that the settlement reached in *Willits v. City of Los Angeles*, No. 10-05782-CBM-MRW (C.D. Cal. Aug. 25, 2016) (the "*Willits* settlement") does not preclude Plaintiff's claims. *See* Dkt. 38 at 5-8; Dkt. 74 at 6-8. As previously stated "[t]he Court concludes both that (1) the express language of the *Willits* settlement does not preclude Plaintiff's claims, and (2) that even if it did, the 'identical factual predicate' test would prevent the *Willits* settlement from releasing these claims, because they are based on accessibility issues arising from alteration of the City's on-street parking facilities, rather than accessing or travelling on the City's pedestrian facilities." Dkt. 74 at 8.

3.     The Court also reincorporates the relevant facts that are not disputed by the parties and were addressed in the Court's prior Order— "that the City is a 'public entity' for the purposes of Title II of the ADA, that Plaintiff Sarfaty is a disabled person for the purposes of the ADA, [and] that on-street public parking falls within the category of a 'service, program or activity' for the purposes of Title II of the ADA. *See e.g., Fortyune v. City of Lomita*, 766 F.3d 1098 (9th Cir. 2014)." Dkt. 74 at 3 n.4.

4.     In *Fortyune*, the Ninth Circuit expressly held that both 28 C.F.R. § 35.150 and 28 C.F.R. § 35.151 require on-street parking provided by a public entity like the City be accessible. In particular, the Ninth Circuit stated that 28 C.F.R. § 35.151(b)(1) "require[s] that all public on-street parking facilities constructed or altered after the ADA's effective date be accessible." 766 F.3d at 1103.

5.     28 C.F.R § 35.151(b)(1) states that: "Each facility or **part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility** or part of the facility shall, **to the maximum extent feasible**, be altered in such manner that the altered portion of the facility is **readily accessible to and usable by individuals with disabilities**, if the alteration was commenced after January 26, 1992." *Id.* (emphasis added). There is no dispute that the alteration of Reseda Boulevard was completed in April 2015.

8

6.    The Court previously concluded that the installation of cycletracks and movement of the preexisting parking spaces away from the curb on this stretch of Reseda Boulevard constituted an alteration for purposes of 28 C.F.R. § 35.151(b)(1), and that therefore the City's on-street parking on this portion of Reseda must "to the maximum extent feasible . . . [be] readily accessible to and usable by individuals with disabilities. . . " Dkt. 74 at 4-6.

7.    No technical specifications for on-street parking exist under the relevant ADA standards. *See* 2010 ADA Standards for Accessible Design available at https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf; *see also* 28 C.F.R. § 35.151(c)(3) (alterations after March 15, 2012 must comply with the 2010 ADA Standards). However, in *Fortyune* Ninth Circuit held that *Auer* deference to the opinion of the Department of Justice ("DOJ") with regard to proper interpretation of § 35.151(b)(1). *Fortyune*, 766 F.3d at 1104.  In an amicus brief filed in *Fortyune*, the DOJ stated that (1) in the absence of technical specifications, Title II's program accessibility standards (expressly referencing § 35.150(a) and § 35.151(a)(1) and (b)(1)) apply to a public entities' on-street parking, and (2) public entities "have a degree of flexibility" in achieving the program accessibility requirements embodied in § 35.150 and § 35.151, and that technical specifications for similar structures (like the accessible spaces for parking lots addressed in the 2010 ADA Standards) provide a "template" for public entities to "apply to and to modify as needed to achieve

9

accessibility of [their] on-street parking." *See* Dkt. 44-7 at 7-8 (DOJ amicus brief in *Fortyune*).

8.    The Court does not find in these circumstances that reference to the technical specifications in the 2010 ADA Standards is helpful in determining whether Plaintiff has established a violation of the ADA. While it is clear from the exhibits presented at trial that none of the on-street parking spaces on Reseda Boulevard meet the technical specifications for accessible parking in the 2010 ADA Standards (because no designated accessible parking is provided), the accessibility challenges Plaintiff testified that he encountered during his use of these on-street parking spaces do not specifically relate to any of the technical requirements in the 2010 ADA Standards. Instead, the challenges he describes arises solely from the broader layout of on-street parking on Reseda, and the distance between the parking spaces and the sidewalk. Because the Court interprets the 2010 ADA Standards as "guidance" for meeting the general program accessibility requirements embodied by § 350.150 or § 350.151 with regard to on-street parking, finding an ADA violation based solely on the basis of a failure to apply those technical requirements by rote would not be appropriate here.

9.    Accordingly, the Court finds that broader program accessibility standard embodied in § 35.151(b)(1), which requires that the altered portion of Reseda Boulevard  be "readily accessible" to individuals with disabilities is the proper lens through which to evaluate Plaintiff's claims. *See, e.g.*

*Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1182 (9th Cir. 2017) (affirming district court analysis of program accessibility under lower standard applicable via § 35.150(a)). The City's argument that "readily accessible" in the on-street parking context requires only compliance with § 35.151(i)'s requirement that accessible curb ramps exist at each intersection is not consistent with the Ninth Circuit's precedent in *Fortyune* and *Kirola*, each of which clearly articulate a broader approach to program accessibility. *See Kirola*, 860 F.3d at 1180-81 (finding that if the relevant technical specifications relevant in that case did not apply, § 35.151 would still require the Court to analyze that "general standard" to determine public entity ADA compliance); *Fortyune*, 766 F.3d at 1103 (describing § 35.151(b)(1) as creating a "general mandate of accessibility").

10.  The Court begins its analysis under this standard by noting two facts it finds to be undisputed on this evidentiary record. First, on-street parking cannot properly be considered "accessible" without consideration of how disabled individuals reach the sidewalk from a parking space, because a parking space is useful only to the extent it permits individuals to reach businesses and other establishments that are connected to on-street parking by a public sidewalk. Turning to the 2010 ADA Standards for guidance on this issue, the Court notes that Section 502.3 of the 2010 ADA Standards expressly requires that "Access aisles shall adjoin an accessible route." 2010 ADA Standards for Accessible Design, available at https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pd

11

f. Similarly, Section 208.3.1 requires that accessible parking spaces be located on the "shortest accessible route" from parking to an entrance. *Id.* Based on this guidance, the Court concludes that whether the on-street parking along the altered portion of Reseda Boulevard is "readily accessible" depends (in part) on whether individuals like Plaintiff may park their vehicles in those spaces and successfully reach the sidewalk in order to reach their final destination.

11.   Second, the existence of a curb presents an additional challenge to wheelchair-bound individuals that other individuals do not face, because they cannot physically step up onto the sidewalk, unlike ambulatory individuals.[1] Therefore, when on-street parking spaces are uniformly placed a substantial distance from the curb, to reach the sidewalk, an ambulatory individual is required only to "cross" the bike lane to access the sidewalk. In contrast, a wheelchair-bound individual must proceed in the bike lane until they reach an accessible curb ramp.

12.   The parties do not dispute that at the intersections of the cross-streets in this portion of Reseda Boulevard, there are accessible curb ramps (i.e. curb ramps as mandated by § 35.151(i)) that are accessible to wheelchair-bound individuals. Additionally, an accessible mid-block curb ramp exists between Rayen Street and Nordhoff Street in the altered portion of Reseda. Given the position of the mid-block curb ramp approximately halfway between Rayen and Nordhoff, this means that in most cases (with the

---

[1] While no evidence was presented on this point, the Court finds this fact to be subject to judicial notice under Fed. R. Evid. 201(b)(1).

12

exception of the shorter distance between Rayen and Gresham, which is only 356 feet), there are roughly 200 yards between accessible intersections. The parking spaces on the altered portion of Reseda Boulevard are not evenly distributed, and in some cases cluster near the intersections, and in other cases are clustered near the middle of the block because of the existence of buffer zones near intersections that restrict parking. *See* City Trial Ex. 4. The Court finds based on this configuration that individuals with disabilities who utilize wheelchairs will frequently have to travel more than 50 yards, and in some cases closer to 100 yards before they reach an accessible curb ramp that permits them to exit the bike lane and enter the sidewalk.

13.     There are a limited number of inactive driveways on this portion of Reseda Boulevard, which create breaks in the curb. *See* Dkt. 89 at 2; Dkt. 85 at 7-8, Plaintiff Trial Ex. 7 at 14. However, there is undisputed evidence in the record that the slopes of all but one of these inactive driveways exceed 8.33%. Dkt. 85 at 7-8, Plaintiff Trial Ex. 7 at 14. This exceeds the maximum slope permitted under Section 405.2 of the 2010 ADA Standards.[1] With the exception articulated in the footnote below, these inactive driveways do not constitute an accessible route to reach the sidewalk from on-street parking.[2]

---

[1] The single inactive driveway with an ADA-compliant slope between Rayen and Gresham is adjacent to three parking spaces on the east side of the street. *See* City Trial Ex. 4 at 1. While the location and distance to that inactive driveway with an ADA-compliant slope make the parking spaces (viewed in isolation) sufficiently accessible, because they are no more than 66 feet from an accessible route, the Court's analysis above applies to each of the other stretches of Reseda Boulevard relevant to this case.

[2] The Court finds that applying the ADA's fixed slope standards to disqualify these steeply sloped inactive driveways in assessing the distance wheelchair-bound individuals must traverse to reach an accessible curb ramp is consistent with Ninth Circuit precedent applying "feature-specific" standards to public entity facilities,

14.   The Court concludes that because the on-street parking on this portion of Reseda Boulevard requires wheelchair-bound individuals to roll in the bike lane for a significant period of time before reaching a sidewalk, it cannot be considered "readily accessible" from the program accessibility perspective dictated by § 35.151(b)(1). The following evidentiary findings and caselaw support this conclusion.

15.   The Court found Plaintiff's testimony regarding his past encounters and continuing fear of cyclists hitting him in the bike lane to be credible. His testimony was also corroborated by the exhibits depicting the width and construction of the bike lanes— each provides a single, relatively narrow bike lane moving in the direction of traffic, and the narrow striped portion of the cycletracks surrounding each of the bollards is not wide enough to permit an wheelchair-bound individual to remain in that zone while rolling towards a curb ramp. It is readily apparent that any encounter between a cyclist and a wheelchair-bound individual in this narrow bike lane carries the potential risk of a collision and possible harm. This constitutes a significant accessibility concern for individuals like Plaintiff.

16.   The Ninth Circuit's holding in *Cohen v. City of Culver City*, 754 F.3d 690 (9th Cir. 2014) also supports this conclusion. After concluding that the "more exacting standards" of § 35.151 applied to an alleged ADA violation, the Ninth Circuit found that "the existence of an arguably

---

even when no specific guidelines existed for the facilities. *See Kirola*, 860 F.3d at 1179-80.

14

marginally longer alternative route" within approximately 20 yards of a blocked curb ramp could not justify summary judgment on that plaintiff's claims under the ADA. *Id.* at 693, 699. Here, the City altered the on-street parking on Reseda Boulevard for reasons unrelated to ADA compliance, and the mere fact that the bike lane will permit wheelchair-bound individuals to *eventually* reach the sidewalk from on-street parking spaces is not sufficient in this context to satisfy the higher standard of program accessibility articulated in § 35.151.

17.     The Court also finds that the City's alterations to Reseda Boulevard particularly disadvantages wheelchair-bound individuals, because they must frequently roll in the bike lane for a significant period of time and avoid cyclists in order to reach the sidewalk.[1] Ambulatory individuals do not face these challenges because they merely need to cross the bike lane to access the sidewalk. Title II of the ADA is plainly intended to redress "*unequal* treatment in the administration of a wide range of public services, programs, and activities . . ." *Tennessee v. Lane*, 541 U.S. 509, 525 (2004) (emphasis). Accordingly, the fact that the City's alteration of the on-street parking on Reseda Boulevard places a substantially higher burden on disabled individuals than on ambulatory individuals supports the Court's

---

[1] The Court also notes that many wheelchair-bound individuals utilize side exit ramps in their vehicles, like Plaintiff did at the time he encountered difficulties parking on Reseda and rolling in the bike lane, because he was no longer able to deploy his lift directly onto the sidewalk. *See* Dkt. 87 at 3. The 2010 ADA Standards expressly mandates for access aisles of 60 inches parallel to accessible parking spots. *See* Section 502.3, 2010 ADA Standards. The advisory guidelines specifically note that "Wheelchair lifts typically are installed on the passenger side of vans. Many drivers, especially those who operate vans, find it more difficult to back into parking spaces than to back out into comparatively unrestricted vehicular lanes. For this reason, where a van and car share an access aisle, consider locating the van space so that the access aisle is on the passenger side of the van space." Section 502.4 (emphasis added). The Court finds these portions of the 2010 ADA Standards relevant in assessing whether the City's decision to install cycletracks and move on-street parking substantially further from the curb creates an accessibility challenge for individuals like Plaintiff.

15

conclusion that the altered portion of Reseda Boulevard is not "readily accessible" for purposes of 28 C.F.R. § 35.151(b)(1).

18. The City argued at trial that the existence of accessible parking provided by private entities in off-street parking lots on this portion of Reseda Boulevard supports a finding that the City's on-street parking is readily accessible. The Court can find no support in Ninth Circuit or persuasive caselaw for the proposition that the Title III obligations of private businesses should factor into the program accessibility requirements of Title II that are specifically mandated for public entities like the City. As a practical matter, this would create substantial uncertainty because different kinds of establishments have different obligations under the ADA, and may or may not be obligated to provide accessible off-street parking. Determining whether the City has complied with Title II based on the then-current Title III compliance of the businesses currently operating on Reseda Boulevard would inappropriately make provision of accessible parking "contingent upon the cooperation of third persons." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1269 (D.C. Cir. 2008); *see also Disabled in Action v. Board of Elections in the City of New York*, 752 F.3d 189, 200 (2d Cir. 2014) (access "should not be contingent on the happenstance that others are available to help"). Moreover, as Plaintiff noted in his testimony, some off-street accessible parking on Reseda Boulevard is not fully ADA-compliant, and to the limited extent it was available during his visits, these parking spaces were often already in use by other customers

16

**19.**    Plaintiff's expert witness Paul Bishop ("Bishop") testified regarding modifications to the on-street parking on the altered portion of Reseda Boulevard. In particular, he identified specific locations on the altered portion of Reseda Boulevard near the intersection of Reseda and Dearborn Street, Rayen Street, Nordhoff Street, and fronting 8920 Reseda Boulevard where accessible parking could be provided, generally near existing curb ramps at intersections. Bishop's testimony established that relatively minimal modifications at these locations would be feasible, because in most cases the changes would amount to painting and signing these locations to reserve them for disabled individuals, and moderate adjustments to the size of the buffer zone and width of the cycletracks. In one circumstance, these modifications require adding a curb ramp. *See* Dkt. 85 at 8-12.

**20.**    The Court finds that the inclusion of four disabled parking spaces at these locations would adequately address the accessibility violations the Court has found exist on this portion of Reseda Boulevard. In particular they ensure that wheelchair-bound individuals have access to on-street parking spaces that are in close proximity to accessible curb ramps, limiting the period of time they must roll in the bike lane in order to reach the sidewalk from the on-street parking spaces.[1] The Court also notes that Bishop's

---

[1] In its arguments at trial, the City describes these proposed modifications as "preferential treatment" for disabled individuals, which the ADA does not require. This is not preferential treatment. The alterations to Reseda's on-street parking create a unique challenge for wheelchair-bound individuals. Providing reserved parking at specific locations that are in close proximity to curb ramps simply minimizes the negative impact of the City's alterations on these individuals.

recommendations are also consistent with guidance on integrating accessible parking with cycletracks recommended by the Federal Highway Administration in a report provided as an exhibit by the City. *See* City Trial Ex. 8 at 97-98 (articulating guidance that accessible parking should be placed near the start of a block and providing exhibits connecting accessible parking to curb ramps).

21.     Public entities like the City are required to meet the "readily accessible" standard with regard to program accessibility of altered facilities "to the maximum extent feasible . . ." 28 C.F.R. § 35.151(b)(1). The court interprets this language to place the burden on the City to show that the changes proposed by Bishop are infeasible.

22.     The City has not shown that these modifications to the on-street parking spaces would be infeasible. The only dispute the City raised at trial was with regard to the slope of these parking spaces, and Bishop's proposed modifications to these locations do not require altering the slope of the road in a manner that would interfere with other state and federal regulations regarding roadways slopes and safe drainage of water.

23.     The only other objection to this proposal raised by the City is general testimony that community response to including accessible parking on Reseda Boulevard was negative. Dkt. 84-5. The Court does not find that this type of community reaction constitutes sufficiently probative evidence of infeasibility, under these circumstances, to defeat feasibility given the

18

general purpose of the ADA, and the lack of caselaw supporting such an inference. *See Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944–45 (9th Cir. 2011 ("[the ADA's] passage was premised on Congress's finding that discrimination against the disabled is 'most often the product, not of invidious animus, but rather of thoughtlessness and indifference, of "benign neglect,' and of 'apathetic attitudes rather than affirmative animus'"). A negative community reaction to inclusion of disabled parking spots does not make increasing accessibility infeasible in these circumstances. *See Bassilios v. City of Torrance*, 166 F. Supp. 3d 1061, 1078 (C.D. Cal. 2015) (finding that community objections to installing a disabled parking spot was not a "relevant consideration").

24.     Because the Court finds that the public on-street parking on the altered portion of Reseda Boulevard is not "readily accessible," and that modifications to the parking that would remedy this issue are not infeasible, it finds that Plaintiff has established that the City has violated Title II of the ADA.

25.     The Court now addresses Plaintiff's damages claim based on the City's alleged deliberate indifference with regard to its violation of the ADA.

26.     In  order to recover monetary damages under the ADA, individual plaintiffs must prove that the public entity *intentionally* discriminated against disabled individuals. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) (citing *Ferguson v. City of Phoenix*, 157 F.3d 668,

674 (9th Cir. 1998)). In *Duvall*, the Ninth Circuit affirmatively adopted "deliberate indifference" as the standard for proving this intentional discrimination. *Id.* at 1138. To establish deliberate indifference, a plaintiff must show that (1) the defendant had "knowledge that a harm to a federally protected right is substantially likely," and (2) the defendant "fail[ed] to act upon that ... likelihood." *Id.* at 1139. The first element of the deliberate indifference test—notice—is satisfied "[w]hen the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation)." *Id.* at 1139. The second element of deliberate indifference is satisfied where "the entity's failure to act '[is] a result of conduct that is more than negligent, and involves an element of deliberateness.'" *Updike v. Multnomah County.*, 870 F.3d 939, 951 (9th Cir. 2017) (quoting *Duvall*, 260 F.3d at 1139); s*ee also Payan v. L.A. Cmty. Coll. Dist.*, 2018 WL 6164269, at *17 (C.D. Cal. Oct. 16, 2018).

27.     The Court does not find that Plaintiff placed the City on notice of his request for accommodation. First, there was no evidence or testimony in the case establishing whether the three letters plaintiff claims he sent to the City's Department of Street Maintenance ("DSM") were ever actually received. Multiple witnesses for the City stated in their direct testimony declarations (and were not cross-examined by Plaintiff on this point) that they could find no records of these letters. Dkt. 84-2 at 3; Dkt. 84-4 at 2. The Court does not find Plaintiff's assertion that he mailed these letters to the DSM sufficient to constitute notice of a request for accommodation. Deliberate indifference requires *intentional* discrimination, and to the

extent that Plaintiff's requests were sent to a City department that does not handle accessibility issues, the Court finds this to be insufficient to satisfy the notice requirement, without any evidence that the City intentionally ignored his request for accommodation. *Duvall*, 260 F.3d at 1138. To the extent that "bureaucratic slippage" may have caused a failure to transfer the letters to the appropriate City Department, the Court also finds that the Ninth Circuit's holdings with regard to the second prong (failure to act) can also be applied to the notice requirement. *See Duvall*, 260 F.3d at 1138-39 ("bureaucratic slippage" not sufficient to constitute a deliberate failure to act).

28.   Plaintiff did have a conversation with Angela Kaufman in her capacity as an ADA compliance officer in September 2016. Plaintiff's direct testimony declaration states that he had a conversation with Kaufman where he made a "request for accessible parking." Dkt. 87 at 5. In his trial testimony, Plaintiff did not testify that he made such an express request, just that he expressed his general displeasure with the cycletracks and wanted them to be removed by the City because he believed they violated the ADA. Ms. Kaufman testified that she remembered the conversation only in general terms (after being refreshed by her participation in this litigation), and that she told Plaintiff that the cycletracks were not going to be removed, and that the City believed they were currently ADA-compliant. The relief that Plaintiff now seeks is not removal of the cycletracks at all, and the Court finds that Plaintiff's conversation expressing his displeasure and seeking their removal is not sufficient notice to constitute a request for accommodation in this factual context.

21

29.      Even if the record contained sufficient evidence to show that Plaintiff made a request for accommodation**,** the Court also finds that the City's conduct here does not meet the second prong of the deliberate indifference standard. The testimony of Angela Kaufman ("Kaufman") during the trial and Plaintiff's recollection of the conversation established that the City believed that further alteration of the public on-street parking on Reseda Boulevard was not legally required by the ADA. Similarly, the direct testimony declaration of Luis Mata established that the City's position at this point in time, as determined by the Department of Disability ("DOD") responsible for addressing accessibility issues, was that complaints regarding the on-street parking on Reseda Boulevard would be resolved through the *Willits* settlement, based on his investigation into the complaint filed by prior Plaintiff Gary Scherer. Dkt. 84-4 at 2. Finally, exhibits provided by the City, the direct testimony declaration of Robert Sanchez, and portions of Kaufman's testimony established that the City had engaged in testing of the cycletracks with wheelchair-bound individuals during installation of the cycle tracks. *See* City Trial Exhibit 10; Dkt. 84-5 at 3-4.

30.     The Court finds that this evidence establishes that the City did not take further action because (1) it did not believe that the ADA required additional modifications to the on-street parking on Reseda Boulevard given the lack of technical specifications for on-street parking, (2) it believed that the parking spaces provided on Reseda were adequate to deploy wheelchairs from vehicles based on previous testing, and (3) the DOD believed that the *Willits* settlement would address the type of complaints raised by Plaintiff in his call with Kaufman.

31.     The City was ultimately incorrect given the conclusions this Court reached above. But the Court does not find that their conduct with regard to Plaintiff can appropriately be described as "conduct that is more than negligent, and involves an element of deliberateness." *Updike*, 870 F.3d at 951. There were (and remain) no technical specifications for on-street parking in the 2010 ADA Standards, and the Ninth Circuit only held that the ADA imposes program accessibility requirements on public entities for on-street parking in September 2014, shortly before the cycletracks were installed. *See Fortyune*, 766 F.3d at 1103. There have been no subsequent Ninth Circuit cases (and very limited district court precedent) applying these broad program accessibility requirements to public on-street parking. *See, e.g. Bassilios*, 166 F. Supp. 3d at 1072-1081. The Court was required to hold a bench trial before it ultimately concluded that the on-street parking on Reseda Boulevard violated the program accessibility requirements of § 35.151(b)(1). Similarly, this Court previously <u>agreed</u> with the City regarding the impact of the *Willits* settlement on these claims, and only reached a different conclusion after considering extrinsic evidence. *Compare* Dkt. 20 *with* Dkt. 38.

32.    As the Court has previously explained, it does not find that rote application of the 2010 ADA Standards regarding off-street parking is appropriate given the nature of Plaintiff's accessibility claims. Therefore, the fact that the on-street parking on the altered portion of Reseda did not comply with those technical specifications does not mean the City's failure to act was deliberate. Similarly, the City's efforts to test the accessibility of the cycletracks with wheelchair-bound individuals during the cycletrack

23

installation process on Reseda strongly suggests that the City's (incorrect) belief that further alteration was not necessary was based on a good faith belief that the cycletracks (as constructed) complied with the ADA.

33.     In these circumstances, the Court does not find that the City acted with deliberate indifference or intentionally discriminated against Plaintiff.

34.     By violating the ADA, the City also violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and California Government Code § 11135. The elements of Plaintiff's ADA claim and claims under these statutes are co-extensive. *See Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 (9th Cir. 1999); Cal. Gov't Code § 11135(b).

35.     The City is ordered to install four ADA-compliant accessible parking spaces and make the modifications proposed by Bishop at the locations specified in his expert report. *See* Dkt. 85 at 8-12.

36.     Plaintiff is instructed to submit a proposed Final Judgment in accord with these Findings of Fact and Conclusions of Law within 21 days of the filing of this Order.


IT IS SO ORDERED


Date:   August 12, 2020

_____

HON. STEPHEN V. WILSON

UNITED STATES DISTRICT JUDGE

24